UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  1:22-CR-10259-WGY |
| | ) | |
| ADERITO PATRICK AMADO, | ) | |
| a/k/a "Pat", "Zeek", "Zeeek" | ) | |
| | ) | |
| Defendant | ) | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

Defendant Aderito Patrick "Pat" Amado was a leader of a largescale drug trafficking organization ("DTO") and conspiracy that operated in the South Shore area during a global pandemic.  From his high-ranking position, Amado supplied and prepared drugs for distribution and personally participated in the distribution of wholesale and street-level quantities of controlled substances (including cocaine, cocaine base, fentanyl, and fentanyl analogue) to a customer base consisting of both large-quantity drug dealers and street-level drug addict customers – all during a global pandemic while on probation for multiple prior drug convictions and equipped with a state court-issued ankle monitor for a prior felony offense.

Amado enlisted and manipulated others to further his drug operations, conceal his connection to criminal conduct, and help to maximize proceeds.  For Amado alone, these proceeds totaled upwards of hundreds of thousands of dollars.  Amado's sophisticated DTO involved the utilization of multiple electronic devices, hydraulic presses, money counters, stash houses, rental vehicles, other vehicles bought in the names of third parties, commercial-grade drug paraphernalia, and firearms equipped with accessories ranging from a laser beam to high-capacity magazines. All of this equipment was geared towards maximizing the volume of drugs moving into the community, the profits returning to the DTO, and the safety of the DTO's members and their

valuable stash.  While Amado gloated about his criminal success on social media and within video messages to associates, he testified far differently at trial.  He minimized his rank, diminished his success, played down his web history, and distanced himself from the very stash location he had rented, equipped, staffed, furnished, and visited on a daily basis for months prior to his arrest (as evidenced by his state-issued ankle monitor data).

The government respectfully requests a sentence of 360 months for Counts One through Four and Six through Seven, followed by the mandatory 60 months on Count Five (as to the conviction on Count Two) – resulting in a requested sentence of ***420 months (or 35 years) imprisonment***.  The government's recommended sentence properly reflects the outrageous quantity of extremely dangerous controlled substances (including multi-kilogram quantities of fentanyl, fentanyl analogue, and cocaine mixed with cutting agents, as well as uncharged kilogram quantities of heroin and pounds of marijuana) that Amado was responsible for supplying, mixing, pressing, packaging, delivering, and distributing within the community.

This sentence also reflects Amado's ongoing enthusiasm for firearms despite being a well-established convicted felon, extensively researching firearms (in particular, Glocks), ammunition, and gun accessories on his web history, storing Glocks at both his residence (Apt. 1321, 333 Ricciuti Drive ("the Ricciuti Location") and stash house (Apt. 401, 35 Audubon Road ("the Audubon Location")), and possessing guns on his person.  It captures the level of manipulation and harm this defendant brought upon others, ranging from DTO members to drug addicted customers.  And it reflects Amado's brazen efforts to mislead the Court and jury through his trial testimony about his role in the DTO, knowledge about the stash house's operations, and the reasons

underlying his drug-and-gun related web history – which forensic evidence and GPS data proved to be false.[1]

Amado's extensive criminal history – which includes a still-pending drug-trafficking case committed **while on state pretrial release for the underlying offense** – shows a strong need for a sentence that will promote both specific and general deterrence.  Amado is a career offender, and the DTO he oversaw consists of a number of individuals some of whom now face state or federal prosecutions.[2]  This Court should send a clear message to drug traffickers, particularly armed drug traffickers – both within this DTO and other groups – about the penalties to be faced for trafficking significant quantities of controlled substances, possessing and utilizing firearms in furtherance of drug trafficking, and overseeing a DTO that amassed great wealth at the cost of others' vulnerabilities and addictions.  This term of imprisonment is significant, but not greater than necessary, to accomplish the goals of sentencing as delineated under 18 U.S.C. § 3553(a).

I.      **Amado's Guideline Sentencing Range is Life Imprisonment (to be Followed by 60 Months' Imprisonment).**

Probation has calculated the Guidelines as life imprisonment to be followed by 60 months imprisonment.  Based on Amado's convictions at trial and this Court's anticipated acceptance of

---

[1] Amado reports that "he has no assets" and "no income."  *See* PSR ¶¶ 171, 172.  The government notes that law enforcement recovered just shy of $300,000 from his residence; about $50,000 from his Jeep (which he purchased for nearly $50,000, paying the registered owner $5,000 cash for keeping it under his/her identity); and just over $17,000 from the stash house.  Amado's bail posted in the state on this offense was approximately $200,000.  And Amado's social media content and phone videos indicated his possession of large sums of cash and designer clothing.

[2] *See generally United States v. Kevin Cardoso*, 23-cr-10017-RGS; *United States v. Giovanni Pina*, 23-cr-10051-WGY; *United States v. Elijah Melton, Samuel Fonseca*, 22-cr-10356-LTS; *United States v. Elijah Melton, Kareem Pires*, 24-cr-0059-JJM-LDA; *United States v. Shavon Gurley*, 24-cr-10271-MJJ.

a statutory enhancement under 21 U.S.C. § 851, he faces a mandatory minimum period of imprisonment of twenty years.[3]

Regarding the Presentence Report's Guideline calculations, the government agrees with Probation's calculation as to drug weight, the application of a two-level enhancement for maintaining a stash house, the application of a four-level enhancement for holding a leadership position, and Amado's status as a career offender. The government respectfully objects to the PSR's sentencing calculation insofar as it does not include a two-level increase for obstruction of justice under U.S.S.G. § 3C1.1. The government addresses each in turn:

## A. Base Offense Level: Drug Weight

Probation has correctly calculated the drug weight attributable to the underlying offense as a base offense level 38. *See* PSR ¶¶ 50, 107-08. Specifically, the Presentence Report calculates the drug weight attributable to the conspiracy that Amado oversaw (and that he possessed with intent to distribute) as consisting of mixtures and substances of over 12 kilograms of fentanyl, over 11 kilograms of fentanyl analogue, over 3 kilograms of cocaine, over 2 kilograms of heroin, and over a kilogram of crack cocaine. *See* PSR ¶¶ 50-51, 100, 108. Evidence at trial establishing this drug weight included detailed, multi-day testimony from MSP Drug Chemist Erin Finch, Trial Exhibits 801, 801.2, 803, 805, and 806 (documenting the lab testing results, including drug type, weight, and overall composition), and Trial Exhibits 1-5 (Ricciuti controlled substances), 101 (Jeep controlled substances), and 201-238 (Audubon controlled substances) (collectively, the

---

[3] The government notes that Amado has two prior state controlled substance convictions. Because of his various arrests and periods of detention attributable to different pending matters (that at times overlapped), Amado appears to have technically served just shy of twelve months' imprisonment on one of those offenses based on in-and-out jail records. If Amado in fact served at least twelve months on that second controlled substance offense, then he would have qualified for two statutory enhancements under 21 U.S.C. § 851, resulting in a mandatory minimum sentence of 25 years' imprisonment on his drug convictions (to then be followed by the 5-year consecutive period of imprisonment dictated by his Section 924(c) conviction). *See* 21 U.S.C. § 841(b)(1)(A).

numerous packages of controlled substances recovered from three locations during law enforcement's investigation).  Trial testimony and forensic evidence from cellphones showed that these identified quantities – significant in and of themselves – in truth only represented ***just one day*** of the DTO's overall trafficking operation at this single location within an otherwise multi-month conspiracy.

Other trial testimony, including testimony from drug customer S.A. and CW-4 (a DTO member), captured the volume and frequency of controlled substances distributed to street level customers and higher-level drug customers.  For instance, CW-4 testified that the defendant supplied this stash house with kilogram quantities of fentanyl and cocaine, sometimes providing raw drugs to customers and other times creating newly formed kilograms at the stash house comprised of cutting agents mixed with fentanyl to sell to wholesale customers; at times, cooking cocaine into cocaine base (crack) and other times, selling drugs to street-level drug customers or coordinating with lower-level DTO members to do the same.  *See, e.g.,* PSR ¶¶ 82-83, 85-86. CW-4 noted that DTO associates delivered his kilograms of drugs to wholesale customers at Amado's direction on multiple occasions.  *Id.* ¶ 85.  CW-4 also testified that Amado enlisted drug dealers to frequent his stash locations to collect controlled substances for distribution and to leave collected drug proceeds in the stash.  *Id.* ¶¶ 82-83, 85-86.  CW-4's testimony was corroborated by Snapchat communications among Erica Vieira, Amado, and other DTO leaders (in which Vieira complained about the needless attention the dealers were bringing to the stash house given the frequency of their drug reup visits, *see id.* ¶ 76) and by the boxes of pre-packaged drugs and money collections that law enforcement recovered from the Audubon Location on January 11, 2021 –

indicating that the drug weights foreseeable to Amado during the drug conspiracy were far beyond those recovered on January 11, 2021.  *See id*. ¶¶ 48-52.

Forensic evidence from the various electronic devices recovered in the investigation, including videos, images, text message, and social media exchanges, further corroborated witnesses' trial testimony about the volume of drugs distributed across the DTO's operations.  *See generally* PSR ¶¶ 58-81.  For example, one trial exhibit captured a Snapchat communication between Amado and other high-ranking DTO members Kevin Cardoso, Giovanni Pina, and Elijah Melton discussing money that a wholesale customer owed for a sold kilogram.  *Id.* ¶ 74.  Another video from Amado's phone showed Cardoso being hit in the face with a cellophane-wrapped kilogram.  *Id.* ¶ 72.  Another Snapchat communication showed Amado discussing an individual who was sampling grams of Amado's drugs off of a kilogram.  *Id.* ¶ 66.  Two of Amado's phones recovered from his Jeep in January 2021 showed that he would contact upwards of fifty drug users on a daily basis from at least November 2020 alerting them about drug availability and coordinating meetups.  *Id.* ¶ 58.

Evidence in the case (including trial testimony from S.A. and CW-4) established that street-level distribution quantities ranged from 2.5 grams (a quarter) to 10-gram quantities (a finger) of fentanyl with cocaine being sold in smaller gram quantities.[4]  PSR ¶ 59.  That evidence was corroborated by images from the Audubon Location and the Jeep on January 11, 2021, which

---

[4] Simple math indicates that if only 10 drug customers each ordered 2.5 grams of fentanyl daily from Sunday to Saturday (i.e., 25 grams/day), such would amount to 175 grams of fentanyl a week – which, over a month, would amount to 700 grams of fentanyl **only to those 10 customers**.  Evidence in this case showed Amado distributing quantities far higher than this to many more than ten customers a day.  For instance, while Amado himself had two drug phones for his customer base, he also had multiple lower-level drug dealers whom he supplied who themselves had their own drug customer base.  In short: the quantities of controlled substances foreseeable to Amado for distribution were significant and far beyond that recovered on January 11, 2021.

showed previously prepared packs of drugs containing small plastic bagged amounts of controlled substances measured out for immediate distribution. *Id.* ¶¶ 48, 51.

The government summarizes the overwhelming evidence capturing the volume of controlled substances recovered on January 11, 2021 alone and trafficked beyond that date because it is mindful of this Court's practice to submit sentencing enhancements to the jury.[5]  Here, the jury's finding as to drug weight for sentencing calculation purposes should be set aside because it shows an inconsistency between the jury's verdict findings on Counts One, Two, Three, and Six (finding the defendant guilty of conspiracy to possess with intent to distribute and possessing with intent to distribute varying mandatory minimum drug weight amounts of mixtures and substances containing detectable amounts of cocaine, fentanyl, and fentanyl analogue) and their finding as to drug weight for sentencing purposes (finding as unproven drug weight as to cocaine, fentanyl, and fentanyl analogue).  Stated differently, it logically makes no sense for the jury to have found that the government proved beyond a reasonable doubt quantities of a mixture and substance containing detectable amounts of *at least* 100 grams of fentanyl analogue, *at least* 400 grams of fentanyl, and *at least* 500 grams of cocaine – but to simultaneously have found drug weight as to those same substances entirely unproven for sentencing calculation purposes.[6]  [It is similarly confounding for

---

[5] The government respectfully objects to this practice now, as it previously objected to this practice pretrial, during trial, and prior to the Court's instruction of the jury because under Supreme Court law, First Circuit precedent, federal statute, and the Sentencing Commission, sentencing enhancements are to be found by the judge, not the jury; a preponderance-of-the-evidence standard governs the inquiry; and a judge must consider all reliable information, not just trial evidence. *See, e.g.*, *United States v. Booker*, 543 U.S. 220 (2005) (advisory Guidelines permit judicial fact-finding at sentencing; disputed issues are to be resolved by the judge, not "the judge working together with the jury"); *United States v. Abraham*, 63 F.4th 102, 111 (1st Cir. 2023); *United States v. Anderson*, 452 F.3d 87, 92 n.3 (1st Cir. 2006) (citing *United States v. Yeje-Cabrera*, 430 F.3d 1, 17 (1st Cir. 2005)); U.S.S.G.§ 6A1.3 & cmt. para 1-3; 18 USC § 3661; Fed. R. Crim. P. 32(i)(3)(A).

[6] In footnote 7 of the PSR, it indicates that the base offense level of 38 would reduce to 30 if the crack cocaine were calculated as powder cocaine.  The government does not believe that is correct.  It believes it would remain at 38 given the quantity of fentanyl and fentanyl analogue noted in paragraph 108.  If the Court utilized the extreme minimum quantities found by the jury (i.e., at least 400 grams of fentanyl, at

the jury to have found drug weight wholly "unproven" for sentencing, but to have found Amado as having maintained a premises for manufacturing or distributing those (apparently unproven) substances.]   A comparison of the questions presented to the jury on the verdict form and sentencing enhancement portion, however, shows an inconsistency in the inquiries' wording that – in the absence of a jury instruction on the meaning of the term "controlled substance" and the applicability of the mixture and substance principle to the drug weight – readily explains that juror confusion, rectifies the inconsistency, and supports this Court determining drug weight by a preponderance of the evidence (as the law permits).[7]

Specifically, as to Counts One, Two, Three, and Six, the verdict form inquired as to the defendant's guilt regarding controlled substances *consisting of mixtures and substances containing detectable amounts of* cocaine, fentanyl, and fentanyl analogue.  *See* Dkt. 305 at 1-4. As to the sentencing enhancement inquiry, however, this language was omitted, with the question instead inquiring strictly about "contraband substances" of "cocaine", "fentanyl," and "fentanyl analogue."  *Id.* at 5.  But evidence at trial did not focus on quantities of these controlled substances in their pure form, only in their mixed or cut form.  This was a distinction of clear import to the jury: at trial, a juror submitted a question during the drug chemist's testimony requesting that the

---

least 100 grams of fentanyl analogue, and at least 500 grams of cocaine on varying counts), the base offense level also would not be 30.  Altogether, the jury's findings result in a quantity of 880 grams of fentanyl, 300 grams of fentanyl analogue, and 1,000 grams of cocaine, which provides for a base offense level of 32 (or a converted drug weight of 5,400 kilograms).  The defense treats the drug weights on Counts One and Two as the same, which the government believes is inaccurate given that those drug weights pertain to the two separate offenses of drug conspiracy (a multi month period) and possession with intent to distribute on January 11, 2021. *See* PSR at 57-58.

[7] The government requested such an instruction in its pretrial submission, during the charge conference, and during the jury instruction process.  While the government believes this was an oversight by the Court, no instruction to the jury on the term "controlled substance" occurred.  Thus, the jury had no instruction or guidance from the court that any and all references to the term "controlled substances" encapsulated the concept of a "mixture and substance containing a detectable amount" of a controlled substance before it was tasked with deliberations – including on the issue of sentencing drug weight calculations and other sentencing enhancements. *Cf* Jury Charge *with* Govt's Filed Jury Instructions, Dkt. 268 at 65.

witness address the purity of the controlled substances and the composition of cutting agents within the mixtures of controlled substances containing fentanyl, fentanyl analogue, and cocaine.

In the absence of a jury instruction clarifying that all references to the term "controlled substances" encapsulated the concept of a "mixture and substance containing a detectable amount" of a controlled substance, the jury's sentencing determination that pure or uncut forms of cocaine, fentanyl, and fentanyl analogue were "unproven" was ostensibly correct – but irrelevant. Given the wording of the sentencing enhancement inquiry, when coupled with the absence of a jury instruction on the definition of "controlled substances", there was a clear misunderstanding as evidenced by the jury's findings on the drug weight verdict counts versus sentencing drug-weight-calculation question. It remains the government's position that the Court utilize the practice adopted by the Supreme Court, First Circuit, Sentencing Commission, and federal law (*see* footnote 5), disregard the jury's consideration of sentencing enhancements, and determine that, under a preponderance of evidence standard, the government has met its burden of establishing the drug weights as set forth in paragraphs 100 and 108 of the PSR. The evidence at trial overwhelmingly showed the outrageous volume of controlled substances this defendant was responsible for supplying, mixing, cutting, and distributing for a period well beyond the quantity of drugs recovered on January 11, 2021 – and certainly in amounts totaling far above 100-, 400-, and 500-gram quantities. To calculate the drug weight in the manner proposed by Amado would require this Court to disregard the actual drugs recovered and entered into evidence. It would also grossly under-represent the amounts plainly foreseeable to Amado during his multi-month drug trafficking operation and result in an unwarranted windfall to a high-volume drug trafficker arising from juror confusion as to legal terminology.

**B. Two-Level Sentencing Enhancement – Maintaining a Stash House**

The government agrees with probation that a two-level enhancement for maintaining a stash house applies.[8]  The law is clear that the stash-house enhancement applies where a premises' principal use is as a distribution site for drugs.  *See United States v. Melendez-Rosado*, 57 F.4[th] 32, 38-39 (1st Cir. 2023) (noting that the stash-house enhancement applies even where a premises may be used for multiple purposes).  Relevant factors when assessing the enhancement's applicability include the activities observed, the quantity of drugs discovered, and the presence (or absence) of drug paraphernalia and tools of the trade.  *See United States v. Jones*, 778 F.3d 375, 385 (1st Cir. 2015).  Additionally, application note 17 flags for consideration "how frequently the premises was used by the defendant" for "distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes."  U.S.S.G. § 2D1.1, cmt. n.17.

The Audubon Location's predominant use was as a stash location for Amado's DTO.  As photos and testimony at trial established, it had no beds (despite being a two-bedroom apartment); had minimal furniture or food; and contained drugs in every room of the location – even in kitchen cabinets.  Closets were stocked with drug paraphernalia and trash bags (filled with the remnants of prior drug packaging); one bedroom contained a large hydraulic press used to form kilogram bricks; the other bedroom was a mixing room containing cutting agents, drugs, mixing bowls, blenders, digital scales, drying racks, cellophane, and other drug trafficking equipment.  *See* PSR ¶¶ 48-52.  Amado was responsible for securing the Audubon Location for the DTO, enlisting his (then nine-month pregnant) girlfriend to rent it, along with the Ricciuti Location, under her identity

---

[8] The government stands by its position that the jury's determination on sentencing enhancements should not apply.  Instead, the Court should make such an evaluation under a preponderance-of-evidence standard.  Nevertheless, the government notes that the jury found this enhancement to have been proven beyond a reasonable doubt.  *See* Dkt. 305 at 5.

(while providing inconsistent employment and salary information in the respective lease agreements). *Id.* ¶ 30.

Law enforcement observed drug distribution activity at the Audubon Location during the weeks preceding the search warrant execution on January 11, 2021, including an item being dropped from the mixing room window to a member below and an individual collecting a nylon bag from outside below the apartment area. *See generally* PSR ¶¶ 16-21. Amado's GPS data showed him routinely frequenting the Audubon Location while on probation, and his Jeep was observed there on at least one occasion during a period when his GPS data showed him in close proximity to the stash house. *Id.* ¶¶ 16-21; 32-33. And testimony from a DTO member (CW-4) established that the Audubon Location's main purpose was to manufacture and prepare significant quantities of controlled substances (including fentanyl, cocaine, and cocaine base) for distribution. *Id.* ¶¶ 82-95. The enhancement applies.

### C. Four-Level Sentencing Enhancement – Leadership Role

The government agrees with probation that a four-level enhancement for leadership role applies.[9] Trial testimony established that Amado was one of four leaders of the DTO. *See* PSR ¶¶ 11, 82-83. Testimony and other evidence (including phone communications forensically extracted from Amado's various devices) established that Amado's management-and-organizer responsibilities included renting the Audubon Location (via his pregnant girlfriend); supplying the Audubon Location with kilogram quantities of drugs, including fentanyl and cocaine; mixing the supplied drugs with cutting agents for subsequent packaging by stash house workers; cooking cocaine into cocaine base; pressing drugs into kilogram bricks; and researching the equipment

---

[9] While the government takes the position that the jury's determination on sentencing enhancements should not apply, the government notes that the jury found this enhancement to have been proven beyond a reasonable doubt, as well. *See* Dkt. 305 at 6.

needed for the stash house to successfully operate (including hydraulic presses, blenders, and firearms). *See generally* PSR ¶¶ 10-14; 58-95; *see also* U.S.S.G. 3B1.1(a) cmt. 4 (nature of participation in the commission of the offense is relevant factor to aggravating role).

Evidence at trial also showed that Amado was responsible for recruiting, training, and paying associates (including Erica, Kayla, and Sheila Vieira) to weigh, measure, and package drugs for lower-level dealers; directing and paying stash house workers to make kilogram deliveries to wholesale drug customers; coordinating with drug customers (both wholesale and street level) and other DTO members on drug sales and proceed collection; and establishing a drug-collection-and-proceed-drop-off system with lower-level drug dealers so as to ensure an efficient and steady stream of drugs out and money into the stash house. *See generally* PSR ¶¶ 10-14; 58-95; *see also* U.S.S.G. 3B1.1(a) cmt. 4 (exercise of decision-making authority, recruitment of associates, and degree of control and authority exercised over others are relevant factors to a leadership enhancement).

Trial testimony also established that drug proceeds from the leaders' and lower-level dealers' distribution activities were pooled together and farmed out amongst the DTO leaders. PSR ¶ 14. Amado clearly claimed a larger share of the fruits of the crime. Amado's level of success and higher share in the profits was evidenced by the volume of cash in his possession (nearly $300,000 at his residence; approximately $50,000 in his Jeep); his purchase of a new model Jeep for nearly $50,000 and payment of $5,000 to the Jeep's registered owner; and his documentation of himself wearing designer clothing and posing with large stacks of cash across social media and

phone communications.  *See* U.S.S.G. 3B1.1(a) cmt. 4 (right to larger share of fruits of crime is factor weighing towards aggravating role).

Lastly, the drug conspiracy that Amado oversaw was extensive in terms of the volume of drugs, volume of customers, and number of participants involved.  In terms of participants, Amado utilized multiple workers to prepare the controlled substances and to deliver kilogram quantities of drugs to wholesale drug customers (e.g., Kayla Vieira, Sheila Vieira, and Erica Vieira).  *See* PSR ¶¶ 12-14; 49, 65, 67, 73, 78, 80, 83, 85.   CW-4 testified that Amado was one of four leaders who operated the DTO (with Kevin Cardoso, Elijah Melton, and Giovanni Pina serving as other high-ranking members).  *Id.* ¶¶ 11, 82-83.  Trial evidence showed that Amado utilized multiple distributors to sell the stash house drugs, including Jonathan Abreu, Leo Monteiro, Vaughn Mitchell, Isiah Pires, Neylton Fontes, and Chaasad Cyprien.  *See, e.g., id.* ¶¶ 12-15, 20, 23-26, 42, 63, 65, 93.  At least two videos at trial showed Mitchell inside the Audubon location, and on one occasion, in a vehicle with the defendant with drugs and cash, *id.* ¶ 73; Fontes and Cyprien were arrested with Amado in his Jeep shortly after visiting the stash house, *id.* ¶ 38.  CW-4's testimony and lease agreements for the Audubon Location and Ricciuti Location also showed that Amado had his then-girlfriend rent both locations (at which he stored guns, drugs, and drug proceeds) under her identity, *id.* ¶ 30.

In terms of volume of drugs and customers, phone evidence showed Amado contacting upwards of fifty-plus drug customers a day for purposes of coordinating drug deals involving controlled substances consisting of detectable amounts of fentanyl, fentanyl analogue, and/or cocaine.  *See* PSR ¶¶ 58, 59.  Other phone evidence along with S.A.'s testimony established that

the defendant's involvement in drug trafficking dated back months before his January 2021 arrest. The evidence amply supports probation's determination that the leadership enhancement applies.

### D.  Two-Level Sentencing Enhancement – Obstruction of Justice

Because the defendant committed perjury when he testified at trial, his offense level should be increased by two levels pursuant to U.S.S.G. § 3C1.1. A section 3C1.1 enhancement is appropriate where the trial evidence "establishes that the defendant gave false testimony concerning a material matter with the willful intent to provide false testimony rather than as a result of confusion, mistake, or faulty memory." *United States v. McKeeve*, 131 F.3d 1, 14-15 (1st Cir. 1997); *citing United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

The law requires that the government prove the defendant's guilt beyond a reasonable doubt and that the defendant need not put on a defense or testify on his own behalf. But in this case, the defendant chose to testify.  On a direct examination lasting all of five minutes, the defendant made several materially false statements.  For example, Amado claimed that the controlled substances recovered from the Audubon Location were not his, *see* Ex. A at 6; that the firearms recovered from the Audubon Location were not his, *id*.; that his only connection to the Audubon Location was "to go and buy drugs off people that ran the house," but that it otherwise was not his stash house,[10] *id.* at 6-8; that he could not "say who [the Audubon Location] exactly belonged to" but that he "s[aw] a couple of people there" (despite GPS data showing him

---

[10] It is telling that the only individuals whom Amado admitted as having a connection to the Audubon Location were individuals who were either deceased ("Junior," i.e., Jonathan DePina) or who had previously pleaded guilty to their involvement in this same drug conspiracy (e.g., Erica Vieira, Kevin Cardoso).  Amado otherwise dodged altogether naming anyone involved in the expansive drug operation he oversaw, including individuals who were present in videos with him (e.g., Vaughn Mitchell, Kareem Pires), present in other videos recovered from devices seized in the investigation (e.g., Giovanni Pina, Elijah Melton), who participated in DTO-related chat communications with him (e.g., Giovanni Pina, Elijah Melton, Kayla Vieira, Sheila Vieira, Chaasad Cyprien, Jonathan Abreu, Isiah Pires), or whom he visited for a birthday party (Giovanni Pina) soon after posing in the Audubon Location's living with two firearms.

frequenting the Audubon Location daily for months, at times for hours on end), *id.* at 8; and that he did not have the ability to go to the Audubon Location freely and remove items from it (despite having his girlfriend rent it and secure four keys for it; staffing Erica Vieira inside of it; and routinely visiting it for months), *id.* at 8-9.

Most notably, Amado claimed that the extensive web history on one of his personal devices, which showed him researching *inter alia* hydraulic presses, blenders, firearms, and cutting agents, was borne out of a casual curiosity when he saw such items at the Audubon Location. Ex. A at 7. Trial evidence, however, showed that Amado was researching at least some of that drug trafficking equipment ***weeks before the Audubon Location stash house even existed*** for the DTO. *See id.* (Def: When I went to Audubon, I'd seen the little soap bars. I Google it on my phone to see what it was. I see the press and I Google it to see what it was. I wasn't . . . I don't know what it was. So I Googled everything that I see. Q: So you saw these things at Audubon when you were visiting your friends? A: Yes.) Put another way, the web history plainly showed the defendant exhaustively researching hydraulic presses in early October 2020 ***before*** he even had his girlfriend rent the Audubon stash house (rented in late October 2020 – making it impossible for the defendant to have seen those presses during an Audubon visit). *See* PSR ¶¶ 70, 97, 99.

In sum, in the course of only a few minutes, Amado denied his high-ranking position within the DTO, denied his overall connection to the Audubon Location, denied his connection to the drugs and firearms in the stash house, denied the foreseeability of controlled substances trafficked during the DTO's multi-month operation, denied (or at least evaded inquiries regarding) his knowledge about other DTO members, and provided a timeline that was definitively false based on digital forensic evidence extracted from his own phone. Each and all of these statements were made under oath during trial during a mere minutes-long direct examination. A defendant does

not have a right to lie on the stand. *See United States v. McKeeve*, 131 F.3d 1, 14-15 (1st Cir. 1997) ("The supportability of this finding [that the defendant committed perjury] likewise defeats the appellant's related claim that the two-level enhancement punished him for exercising his constitutional right to testify in his own defense. ***That right, though precious, does not include a right to commit perjury***." (emphasis added)). Making several materially false statements to a jury about under oath merits a sentencing enhancement pursuant to U.S.S.G. § 3C1.1.

Furthermore, Amado's testimony at trial was not the first time he sought to provide false information to a court. As was argued at Amado's federal detention hearing in this case and presented in a state court proceeding, Amado previously submitted false information to the state court in connection with a drug-trafficking offense. *See* Ex. B (introduced at Amado's federal detention hearing in February 2023). The state court ultimately determined that Amado's submitted materials concerning an alleged job offer awaiting him (from an "Anisha Lopes", i.e., the renter of the Audubon and Ricciuti Locations) "were fraudulent" and that Amado's attorney "was unaware of his client's attempt to perpetrate a fraud upon the court." *See id.* at 3. As a result of that fraudulent conduct, the state court increased Amado's bail. Thus, even if the Court finds that the obstruction of justice enhancement does not apply, Amado's false trial testimony should still be considered under 18 U.S.C. § 3553(a)'s factors as grounds supporting a sentence of 35 years imprisonment because Amado testified in this manner knowing the full import of being truthful in a court proceeding.

### E. Defendant Qualifies as a Career Offender and Is an Established Recidivist

The government agrees with probation that Amado qualifies as a career offender because he "committed the instant offense of conviction subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.2(c).

As reflected in the Presentence Report, Amado has two prior controlled substance offenses.  *See* PSR ¶¶ 124 & 125.  The Sentencing Guidelines state that "[t]he date that a defendant sustained a conviction shall be the date that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contender." U.S.S.G. § 4B1.2(c).  As to each of those offenses, Amado was sentenced on or about September 9, 2020.  *See* PSR ¶¶ 124 & 125.

At trial, Amado was convicted of four controlled substance offenses, including a drug conspiracy count and three separate counts for possessing with intent to distribute controlled substances (that included fentanyl, fentanyl analogue, and/or cocaine).  *See* PSR ¶ 2.  The three possession-with-intent-to-distribute convictions were based on conduct that occurred in January 2021 (*see* Counts Two, Three, and Six of the Third Superseding Indictment).  Thus, at a minimum, Amado's two prior state drug convictions from September 2020, along with each of his three federal possession-with-intent-to-distribute in January 2021 convictions, satisfy the qualifications for Amado to be deemed a career offender.  *See* U.S.S.G. § 4B1.2(c).

But even if Amado had not been convicted of Counts Two, Three, and Six (i.e., possession with intent to distribute controlled substances on or about January 11, 2021), he still may be deemed a career offender under his conviction for drug conspiracy charged in Count One.  First Circuit law indicates that the defendant would be a career offender ***even if he had only been convicted of the federal conspiracy offense*** because trial evidence established that the drug conspiracy continued after September 2020. *See United States v. Elwell*, 984 F.2d 1289, 1298 (1st Cir. 1993) (stating "continued participation in a conspiracy after a felony conviction renders that conviction a prior felony conviction"); *United States v. Lino*, 493 F.3d 41, 43-44 (1st Cir. 2007) (stating "[o]ur approach of focusing on the defendant's continued participation in the conspiracy after being convicted of a drug felony is consistent with furthering the sentencing enhancement's

purpose of punishing recidivism; . . . if the rule advocated by [the defendant] were adopted, we would insulate the very career criminals the [enhancement] is designed to reach-those continuously engaged in criminal conduct" (internal citation and quotation marks omitted)); *cf. United States v. De Jesus Mateo*, 373 F.3d 70 (1st Cir. 2004) (defendant's prior convictions for felony drug offenses counted for imposing life imprisonment term upon conviction for conspiring to possess narcotics with intent to distribute, even though prior convictions were part of same conspiracy).

Amado does not contest that he has two prior controlled substance convictions; he simply seeks to lump them into his drug conspiracy, ostensibly manipulating the circumstances of his prolific and well-litigated drug trafficking career in state court to reduce his criminal history and/or other sentencing implications.  The law, however, rejects that approach.  *See United States v. Martinez-Medina*, 279 F.3d 105, (1st Cir. 2002) (rejecting defendant's argument that two prior felony drug convictions should have been lumped together because they represented ongoing criminal conduct); *United States v. De Jesus Mateo*, 373 F.3d 70 (1st Cir. 2004) (defendant's two prior convictions for felony drug offenses counted for purposes of imposing life imprisonment term upon conviction for conspiring to possess drugs with intent to distribute, even though prior convictions were part of same conspiracy).

## II.   The Factors Outlined in 18 U.S.C. § 3553(a) Support the Government's Measured Sentencing Recommendation of 35 Years in Prison

Each of the factors set forth under 18 U.S.C. § 3553(a), individually and in combination, supports the government's recommended sentence of 35-years' imprisonment.  The government's recommendation is a ***below guidelines*** recommendation for a high-volume drug trafficking leader, firearm enthusiast, and entrenched recidivist.

Amado oversaw an expansive, multi-membered, sophisticated-in-execution DTO.  As previously noted, the shocking quantity of controlled substances recovered on January 11, 2021

from the Audubon Location (and to a lesser degree, Amado's Jeep and the Ricciuti Location) represented just **one day** in the life of Amado's multi-month operation. Trial testimony, including from a DTO member (CW-4), a DTO drug customer (S.A.), surveilling law enforcement officers involved in the investigation, and a digital forensic examiner established that Amado oversaw, directed, supplied, and/or was otherwise involved in trafficking drug quantities consistent with those recovered on January 11, 2021 **for months preceding that date** to wholesale and street-level drug customers alike.

Amado was intimately involved in all facets of the illegal business he oversaw. He located and rented the stash house; assisted in equipping the stash house with its extensive drug trafficking equipment; supplied kilogram quantities of controlled substances to the stash house; mixed raw forms of fentanyl and fentanyl analogue with cutting agents, controlling the drug-to-cut ratio; pressed the drugs into kilogram bricks for the wholesale customers; cooked cocaine into crack; and coordinated drug deliveries with high-level and low-level customers alike, at times interfacing directly with those customers for drug deals. *See generally* PSR ¶¶ 11-14, 58-95.

Amado was diligent in his practices. He took notes on his cellphone of suspected "Cop Cars", PSR ¶ 69; he trained DTO members on how to weigh, measure, and package drugs to ensure a steady supply of ready-to-distribute drug packs, *id.* ¶¶ 83, 85-86; he assisted in providing rental vehicles that lower-level DTO members could utilize for their drug distribution deliveries, *id.* ¶¶ 17, 28, 29, 34; and he was known to his extensive customer base by the false identity, "Zeek", *id.* ¶ 58. As trial testimony and evidence showed, Amado's conscientiousness about concealing his unlawful practices extended to the stash house's window blinds in the mixing room (cut to assist the dropping of drugs or keys to DTO members below), to its trash (deposited far from the complex) and to his phones (two for drug customers; two for personal use and DTO coordination).

Amado took measures to protect his business, exhaustively researching firearms (mainly Glocks) and accessories. Amado kept serious firepower at both his stash house and residence. When law enforcement searched the Audubon Location, they recovered three firearms in the mixing room on a shelf with ammunition. Those firearms included one with a laser beam and a large capacity extended magazine; another with a custom Zev slide; and a third (a MasterPiece Arms). On that same mixing room shelf was a speed loader and a second, large capacity, extended magazine along with boxes of ammunition; Amado's fingerprints were recovered on the ammunition tray inside one of the ammunition boxes. *See* PSR ¶¶ 51-52. At the Ricciuti Location, Amado had a loaded Glock stashed in a master bathroom vanity with a 13-round capacity magazine, along with two empty 13 round capacity magazines. Immediately next to the gun was roughly $170,000 – another $100,000-plus was in the master closet. In the world of drug dealing, guns and drugs commonly go hand-in-hand. *See United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014) ([T]he connection between drugs and violence is, of course, legendary."); *United States v. Gilliard*, 847 F.2d 21, 25 (1st Cir. 1988) (firearms are "tools of the [drug] trade"); *also United States v. Randle*, 815 F.2d 505, 508 (8th Cir. 1987) ("Firearms are frequently possessed by narcotics dealers to protect themselves and their drugs."). Here, Amado united serious quantities of dangerous controlled substances with serious firepower at his home and his business. It is impossible to quantify the dangers of those items in the hands of an intensifying recidivist immune to the fear of repercussions to himself or harm as to others.

Amado was careful and calculating as to whom he invited into his inner circle. Other DTO members largely consisted of younger associates, many in their early twenties with little to no criminal records (*see, e.g.*, Giovanni Pina; Chaasad Cyprien; Elijah Melton). Other individuals in vulnerable predicaments found themselves prey to Amado's opportunism. Anisha Lopes was nine-

months pregnant when she found herself putting her name (and inconsistent employment and salary information) on two lease agreements for Amado's benefit.  Erica Vieira was homeless in a global pandemic; Amado staffed her in the Audubon Location to man the door, monitor low-level dealers' collection of drugs or proceed drop-offs of proceeds, and report up the chain as needed.  S.A. was a drug addict in need of money; Amado enlisted S.A. to purchase his Jeep under S.A.'s identity in exchange for $5,000 cash.  Co-defendant Neylton Fontes was released from a multi-year state prison sentence in November 2020 with no family or place to live; he accompanied Amado on drug deals and resided in a location that investigators had identified as a prior suspected DTO stash house.  Amado structured his drug trafficking operation with built-in layers of protection for himself, while leaving younger, less savvy, and more vulnerable individuals with criminal exposure.

Amado did all of this while on probation for a state drug conviction and wearing a court-issued GPS ankle monitor. This demonstrates the defendant's complete and total lack of respect for the law.  That Amado took extensive efforts to conceal his ongoing illegal conduct – despite knowing he wore a GPS monitor – leads to several conclusions:  Amado did not believe anyone was monitoring his GPS data; if they were, those movements would be immaterial in the absence of other evidence; and that even if exposed, the rewards gained from his DTO's successful operation were well worth the risk of any court-sanctioned repercussions.  Put another way: the goal of securing significant ill-gotten gains for Amado far outweighed the justice system's threat of a few more years in jail – a threat with which he was already well-experienced and unintimidated of by January 2021.

Indeed, by January 2021, Amado had an impressive criminal career.  He had prior convictions for, *inter alia*, possession of a firearm or ammunition without FID card, possession of

a large capacity weapon, assault and battery, witness intimidation, possession with intent to distribute drugs (class B), possession of a class B drug, drug distribution (class A), larceny (multiple), resisting arrest, and vandalism.  He also had arrests for offenses ranging from larceny, knowingly receiving stolen property, disorderly conduct, trespassing, possession with intent to distribute (class D), and possession with intent to distribute (class B).

And Amado's criminal activity did not stop while on state pretrial release for this very offense.  Prior to federal indictment and while the state iteration of this case was pending, Amado was arrested once again for cocaine and fentanyl drug-trafficking charges that also included charges for assault and battery with a dangerous weapon, reckless operation of a motor vehicle, resisting arrest, and failure to stop for police.  *See* PSR ¶¶ 131, 132.  Amado's level of dangerousness shows no signs of stopping – not while on probation equipped with an ankle monitor, not while on pretrial release for a significant drug trafficking offense, not even when in jail, as reflected in disciplinary records showing conduct including possessing contraband, fighting, destroying property, refusing orders, fights, faking illness or injury, lying to staff members, assault on staff members, and possessing weapons.  *See* PSR ¶¶ 3, 121, 162.  And Amado's selfishness and disturbing lack of regard for others is far from a recent development; his shocking behavior extends to his adolescence when he was expelled from school for sexually assaulting a female student after admitting to penetrating a victim's vagina with a pencil – and subsequently mocking her about it.  PSR ¶ 166.

Despite being a career offender, Amado's longest prison term has been about four years (for a subsequently vacated offense); he otherwise has sentences ranging between probation and two years.  Amado's prior state court experience plainly has done nothing in the realm of deterrence.  Throughout that period, Amado has not stopped in his criminal endeavors.  In truth,

his activity has only escalated in nature and extent.  And he has gone on to recruit and train others, showing the ripple effects that one individual's harmful conduct may have on a community far beyond the drug customers he served.

It is unclear to the government whether any hope remains for this defendant.  What is clear is that a message must be sent, both to this defendant and to the community at large about the seriousness with which the federal court views this level of disrespect for the law; this level of recidivism; this level of drug trafficking; this level of reckless enthusiasm for firearms; this level of manipulation of others; and this level of brazen disrespect for the Court (as evidenced by Amado's trial testimony, fraudulent submissions in state court, conduct on state probation, and conduct on pretrial release).

A significant sentence is warranted to serve the important interests of protecting the public from this defendant, promoting respect for the law, and providing just punishment for this offense. Moreover, a substantial sentence is warranted to provide specific deterrence as to Amado (clearly entrenched in an intensifying criminal career), and general deterrence to other DTO members whom Amado trained and mentored – or as to others in the community engaging in similar conduct attracted to the lure of substantial wealth but who view the risk of a significant prison sentence as unrealistic.  A sentence of 35 years' imprisonment (including 30 years on Counts One through Four and Six through Seven, and 5 consecutive years under Count Five) is sufficient, but not greater than necessary, to meet the goals of sentencing as delineated under 18 U.S.C. § 3553(a).

## Conclusion

For the foregoing reasons, the government respectfully requests a sentence of ***420 months imprisonment (35 years) to be followed by five years of supervised release***.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    */s/ Kaitlin R. O'Donnell*
            Kaitlin R. O'Donnell
            Philip A. Mallard
Date:  October 10, 2024            Assistant United States Attorneys

<u>**CERTIFICATE OF SERVICE**</u>

       I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kaitlin R. O'Donnell*
Kaitlin R. O'Donnell
Assistant U.S. Attorney

Date: October 10, 2024